UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No.: 15-11(DSD/DTS)

Tase Brown, Melonie Scott
and Ashley Scott,

                Plaintiffs,

v.                                                    **ORDER**

City of Bloomington,
Matthew George, a Minnesota
peace officer (Bloomington)
sued in his personal capacity,
Carolyn Kne, a Minnesota
peace officer (Bloomington)
sued in her personal capacity,
and John and Jane Does 1-10,

                Defendants.


        A.L. Brown, Esq. and Capitol City Law Group, LLC, 287 East
        Sixth Street, Suite 20, Saint Paul, MN 55101, counsel for
        plaintiffs.

        Jason M. Hiveley, Esq. and Iverson Reuvers Condon, 9321 Ensign
        Avenue South, Bloomington, MN 55438, counsel for defendants.


    This matter is before the court upon the motion for summary

judgment by defendants City of Bloomington; Matthew George and

Carolyn Kne, acting in their individual capacities as officers of

the Bloomington police department; and John and Jane Does 1-10.

Based on a review of the file, record, and proceedings herein, and

for the following reasons, the court grants the motion in part.

**BACKGROUND**

This civil rights dispute arises out of defendants' response to a November 4, 2014, report that plaintiffs Melonie Scott and Ashley Scott were committing fraud at Bloomington Lincoln Mercury car dealership in Bloomington, Minnesota.

On September 20, 2014, Melonie went to the dealership to purchase a new car and trade in her then-current vehicle, a 2008 Dodge Caliber. Melonie Dep. at 7:1-18. At the dealership, Melonie worked with Rocky Foster - the finance manager - and Renaldo Dennis. Id. at 36:1-4. Melonie decided to purchase a 2012 Chevrolet Captiva and entered into a "Retail Installment Contract and Security Agreement" with the dealership. Id. at 7:1-7; see Hiveley Aff. Ex. D. Under the terms of the agreement, Melonie agreed that the remainder of the loan outstanding on the Caliber would be added to the loan for the Captiva.[1] Hiveley Aff. Ex. D at 56-57. Melonie and the dealership also entered into a "Conditional Delivery Agreement, Addendum to Installment Sales Contract." Id. at 53. The addendum provides that the dealership would deliver the Caliber to Melonie conditioned on its ability to obtain financing from a lending institution. Id. In the event the dealership was unable to obtain financing, Melonie was obligated either to pay the full purchase price of the vehicle or immediately return it to the

---

[1] Melonie traded in her Caliber at a value of $0. Hiveley Aff. Ex. D. at 56-57.

dealership.[2]  <u>Id.</u>

After signing the above paperwork, Melonie left the dealership with the Captiva.  <u>See</u> Melonie Dep. at 47:3-23.  Although she had not read all of the paperwork, Melonie believed that she had completed the requisite forms and was to begin making monthly payments of $403.67 to First Investors beginning November 4, 2014.[3] <u>Id.</u> at 25:1-26:5, 43:1-12.  Within a week of leaving the dealership, Melonie received a welcome call from First Investors regarding the financing of her vehicle, but received no other information.  <u>Id.</u> at 38:15-19.

A week later, Melonie returned to the dealership to pickup license plates for the Captiva.  <u>Id.</u> at 35:6-14.  Rocky Foster informed her that the plates had not yet arrived, but would be in soon.  <u>Id.</u>  Foster also requested paycheck stubs for income verification purposes, which she provided.  <u>Id.</u> at 35:6-14. Melonie left the dealership under the impression that the deal was

_____

[2] Melonie testified that she completed a handwritten credit application in order to obtain financing.  Melonie Dep. at 7:19-8:17.  The application, however, was not produced in discovery, and Melonie has not seen the application since she completed it.  <u>Id.</u> at 8:2-11.  Rather, the application that was in the possession of the dealership, and that was produced during discovery, is typewritten and contains numerous errors.  Specifically, it misspells Melonie's name and contains incorrect income, contact, and employment information.  <u>Id.</u> at 8:20-24, 12:1-16:22.  Melonie believes that a dealership employee falsified the inaccurate typewritten application.  <u>See</u> Compl. ¶ 33.

[3] Melonie testified that someone at the dealership informed her that First Investors, a lender, would provide the financing. Melonie Dep. at 38:8-14.

complete.  Id. at 36:17-23, 43:17-21.

The dealership, however, later informed Melonie that it was unable to obtain financing, accused her of lying on the credit application in order to steal the vehicle, and asked her to return the Captiva.  Id. at 28:8-29:15.  After consulting with various attorneys, she decided not to return the vehicle.  Id. at 29:15-21.

On November 4, 2014, Melonie, accompanied by her sister plaintiff Ashley Scott, returned to the dealership in a rental car[4] to make her first loan payment and to pickup license plates for the Captiva.[5]  Id. at 46:9-13; Compl. ¶ 43.  At the dealership, Melonie complained to the finance director, Matthew Zarras, about not receiving her license plates sooner.  Melonie Dep. at 54:13-19. Zarras informed her that they were working on the problem, asked her to wait, and left.  Id.  Zarras subsequently called the Bloomington police to report a fraud in progress.  Id.; Incident Report, Hiveley Aff. Ex. E at 5.

Officer Robert George and other unidentified officers responded to the call.[6]  Melonie Dep. at 55:12-22; Incident Report

_____

[4] Melonie and Ashley arrived in a rental car because the dealership tags on the Captiva had expired.  Melonie Dep. at 47:3-48:14.

[5] Melonie went to the dealership to deliver her first payment instead of sending it to the financing company because she did not receive any information concerning where to send her payments. Melonie Dep. at 51:5-19.

[6] It is unclear how many officers responded to the call.

4

at 05. Once the officers arrived, an officer informed Melonie and Ashley that they were responding to a report of a stolen vehicle. Melonie Dep. at 55:12-22. Melonie protested that she did not steal a vehicle, and, in response, George told her and Ashley to "be quiet, have a seat ..., and don't move."[7] Id. Ashley testified that George told them that they were detained. Ashley Dep. at 24:13-17. George then went to speak with Zarras while an officer in plain clothes stood by the exit. Melonie Dep. at 55:12-22; Ashley Dep. at 23:23-24:3. Zarras informed George that Melonie had previously been at the dealership to buy a Captiva, but that the dealership was unable to secure financing through First Investors. Incident Report at 5. Zarras explained that First Investors had advised the dealership that they were unable to verify Melonie's employment because of inaccurate and false information provided on the application. Id. Zarras also told George that he had attempted to resolve the problem with Melonie and that she had provided additional contact information for an employer, but First

---

[7] Melonie did not explicitly testify that George was the officer who told her and Ashley to be quiet and not move. See Melonie Dep. at 55:12-22. She did testify, however, that this same officer then went to speak with Zarras. Id. Therefore, it is reasonable to conclude that George is the officer who detained Melonie and Ashley because he interviewed Zarras. See Incident Report at 5-8. Further, George does not deny that he was the officer who told Melonie and Ashley to have a seat and not move.

Investors could not verify that information either.[8] Id. at 6. Finally, Zarras stated that he told Melonie that the loan was not approved and that she needed to return the car per the terms of the agreement, but she refused. Id. Zarras informed George that he did not want to press any charges if Melonie agreed to return the Captiva in exchange for her Caliber.[9] Id. at 7.

After speaking with Zarras, George told Melonie that the dealership did not want to press charges. Brown Aff. Ex. 1 at 5:08-5:38. Melonie asked George what charges could be filed, and he responded that she lied on the credit application, which was a crime. Id.; Melonie Dep. at 58:4-17. She disputed that she provided false information on her application and told George that the dealership employees had filled out the incorrect credit application. Incident Report at 8. She also informed him that she had consulted with several attorneys about the car and that one attorney advised her to keep the car. Id.; Brown Aff. Ex. 1 at 4:30-50. Melonie and Ashley testified that George was not interested in hearing their side of the story and refused to look at paperwork that Melonie claimed supported her position. Melonie Dep. at 60:15-61:13; Ashley Dep. at 37:4-9. George then gave

_____

[8] Melonie denies that the dealership had informed her that there were inaccuracies or false information on her credit application. Melonie Dep. at 42:10-43:25.

[9] George did not speak with the employees who had helped Melonie when she bought the Captiva because they had been fired prior to the incident. Melonie Dep. at 59:1-9.

Melonie a choice between exchanging vehicles or being arrested for theft by swindle. Brown Aff. Ex. 1 at 5:50-6:10; Melonie Dep. at 58:10-17; Ashley Dep. at 25:8-10.

George proceeded to ask Melonie where the Captiva was located, and Melonie informed him that it was at her mother's home.[10] Melonie Dep. at 70:8-20. Although Melonie did not remember her mother's address, she knew how to get there. Id. Melonie called her mother on her cell phone so that George could speak with her, but Brown was uncooperative and did not provide her address. Id. at 71:14-17; Incident Report at 8.

Because she did not want to be arrested, Melonie agreed to lead the police to her mother's house in Richfield, Minnesota. Melonie Dep. at 79:8-15; Incident Report at 8. Before leaving the dealership, George seized Melonie's identification and cell phone. Melonie Dep. at 81:10-13; Brown Aff. Ex. 1 at 11:00-15. Ashley asked George whether she could get a copy of the report that was going to be filed. Brown Aff. Ex. 1 at 11:30-35. George responded that there was not going to be any report because this was a "civil matter." Id. at 11:35-50. Melonie and Ashley got into the rental car driven by Sayeed Omar, Melonie's friend,[11] and proceeded to

---

[10] Melonie's mother is plaintiff Tase Brown. Melonie had been living intermittently between Ashley's apartment and her mother's house. Melonie Dep. at 18:25-19:9; Ashley Dep. at 8:13-10:9.

[11] Sayeed Omar did not enter the dealership and is not a party to this action.

drive to Brown's house, followed by three or four squad cars.[12] Melonie Dep. at 17:6-24, 109:9-10.

En route to Brown's home, Melonie called her mother on Ashley's cell phone and told her that she was leading the police to her home. Id. at 82:4-10; Ashley Dep. at 40:4-14. Brown told Melonie that she did not want the police at her home. Melonie Dep. at 81:22-25; Ashley Dep. at 40:4-22. Omar then stopped the rental car, and Melonie told the police that her mother did not want them at her house. Melonie Dep. at 82:22-83:3; Incident Report at 8. According to Melonie, the police told her that she would be arrested if she did not continue to her mother's house. Melonie Dep. at 82:22-83:3. Brown heard this over the phone and decided to allow Melonie to lead the police to her home. Id.

On arriving at Brown's home, the police pulled up to the side of the rental car and told Melonie and Ashley to stay in the vehicle while they waited for the Richfield police to arrive. Ashley Dep. at 43:21-44:9. Soon thereafter, three Richfield officers arrived, and Ashley and Melonie exited the rental car and walked towards Brown's home.[13] Ashley Dep. at 45:1-10; Incident Report at 8. Brown then exited her home and, while in the middle of the street, yelled at the police to leave her property. Melonie

---

[12] The squad cars did not have their emergency lights on. Melonie Dep. at 109:12.

[13] It is unclear whether Omar remained in or exited the vehicle.

Dep. at 83:25-84:14; Incident Report at 8.

Brown, Melonie, and Ashley went into the house, and several police officers approached the front and back door and were also on other areas of the property. Melonie Dep. at 84:5-14; Ashley Dep. at 47:11-15; Brown Dep. at 31:23-32:3. Brown again told the officers to leave her property. Brown Dep. at 33:12-14. Melonie told the officers that she was not going to give up the vehicle and, approximately twenty minutes after arriving at Brown's home, the officers departed. Melonie Dep. at 87:6-20; Incident Report at 0008.

George returned to the dealership to inform Zarras that Melonie was not going to return the vehicle, and the dealership decided to press criminal charges. Incident Report at 9. On November 6, 2014, defendant Officer Kne executed a search warrant and, pursuant to the warrant, seized the Captiva located in Brown's garage. Brown Dep. at 41:2-43:5; Incident Report at 16. Kne arrested Brown for aiding and abetting a theft by swindle, and the Captiva was returned to the dealership. Incident Report at 13, 16.

On the same day, Melonie learned about her mother's arrest and turned herself into police. Melonie Dep. at 89:11-91:17. Brown and Melonie were released the same day, and both were acquitted after separate trials. Melonie Dep. at 92:14-15, 101:22-102:5; Brown Dep. at 59:10-60:2.

On January 5, 2015, plaintiffs filed suit alleging that George and John and Jane Does unreasonably seized Melonie and Ashley at the dealership (Count I), unreasonably seized Melonie and Ashley in the escort to Brown's home (Count II), and unreasonably searched and seized Brown's home (Count IV) all in violation of the Fourth Amendment; that George unreasonably seized Melonie's cell phone in violation of the Fourth Amendment (Count III); and that Kne and John and Jane Does violated the Fourteenth Amendment (Count VI) and committed conversion (Count VII) by transferring the Captiva to the dealership without due process.[14]  Defendants now move for summary judgment.

## DISCUSSION

### I.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

---

[14] Plaintiffs concede their <u>Monell</u> claims against the City of Bloomington and their claims against all defendants for submitting misleading statements to obtain a warrant (Count V) and defamation (Count VIII).  Pls.' Opp'n Mem. at 1 n.1.  Those claims, therefore, are dismissed with prejudice, and the City of Bloomington is dismissed from this action.

(1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. <u>See</u> <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient ....").

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. <u>Id.</u> at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324. A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 322-23.

## II. John and Jane Doe Defendants

As a preliminary matter, defendants argue that the unidentified defendants must be dismissed from the action as a matter of law. It is improper for a court to dismiss unnamed defendants early in litigation where it is likely that discovery may lead to the defendant's identification. <u>Munz v. Parr</u>, 758 F.2d 1254, 1257 (8th Cir. 1985). But a court may dismiss unnamed defendants "when it appears that the true identity of the

defendant[s] cannot be learned through discovery or the court's intervention." Id.

Here, discovery has been completed, the deadline for amendments has passed, and plaintiffs do not seek additional discovery or ask for the court's intervention in identifying the unnamed defendants. Indeed, plaintiffs do not state any opposition to the defendant's argument that these defendants should be dismissed. Accordingly, the court dismisses the John and Jane Doe defendants from this action with prejudice.

## III. Fourth Amendment

### A. Seizure at the Dealership (Count I)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This right "protects people, not places, and wherever an individual may harbor a reasonable expectation of privacy" and extends to protect persons from unreasonable searches and seizures even as they "walk[] down the street." Terry v. Ohio, 392 U.S. 1, 9 (1968)(internal quotation marks and citation omitted). But not every interaction "between policemen and citizens involves seizures of persons." I.N.S. v. Delgado, 466 U.S. 210, 215 (1984)(internal quotation marks omitted)(quoting Terry, 392 U.S. at 19 n.16). A seizure occurs when an officer restrains a person's liberty through either "physical force or show of authority." Id. A seizure need

not always constitute a formal arrest; what first appears to be a consensual encounter between law enforcement and a person "can be transformed into a seizure or detention ... if, in view of all the circumstances ..., a reasonable person would have believed that [s]he was not free to leave." Id. (internal quotation marks omitted)(quoting United States v. Mendenhall, 466 U.S. 544, 554 (1980)).

George argues that no seizure occurred at the dealership because a reasonable person would have felt free to leave. Specifically, he points out that no physical force was used against Ashley or Melonie and that he and the other officers stated that they were there merely to assist in the exchange of vehicles. This argument is not persuasive. First, as already discussed, a seizure can occur even though no physical force is used. See Delgado, 466 U.S. at 215. Further, although George stated that this was a civil matter, the officers also stated that they were there to respond to a report of a stolen vehicle, specifically told Melonie and Ashley that they were "detained" and not to move, and an officer blocked the exit to the dealership as George spoke with Zarras. Under these circumstances, a jury could reasonably conclude that George seized Melonie and Ashley at the dealership. But the Fourth Amendment only protects against "unreasonable" seizures. To determine whether a seizure is reasonable, the court must first determine what type of seizure occurred.

Generally, there are two types of seizures. The first is a "brief investigative" stop that is limited in scope, commonly known as a Terry stop. Navarette v. California, 134 S. Ct. 1683, 1687 (2014); see also United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012)("[T]he scope of an investigatory detention under Terry v. Ohio is limited."). An officer may perform a Terry stop without a warrant when the officer has "reasonable suspicion," that is, the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette, 134 S. Ct. at 1687 (internal quotation marks and citation omitted). The officer cannot rely on "inarticulate hunches" to justify a Terry stop. United States v. Jones, 606 F.3d 964, 966 (8th Cir. 2010)(internal quotation marks omitted)(quoting Terry, 392 U.S. at 22). The reasonable suspicion standard is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Navarette, 134 S. Ct. at 1687 (internal quotation marks and citation omitted).

The second type of seizure is an arrest. An arrest occurs when "an officer exceeds the permissible scope of Terry," and it "must be supported by probable cause." Aquino, 674 F.3d at 924; see also United States v. Smith, 648 F.3d 654, 659 (8th Cir. 2011)(internal quotation marks and citation omitted)("A Terry stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable

force.").

George argues that he performed a <u>Terry</u> stop and, therefore, the reasonable suspicion standard should apply. Plaintiffs argue that a probable cause standard should apply because George arrested them. As to the detention at the dealership, the court agrees with George.

George and the other officers only briefly detained Melonie and Ashley at the dealership to investigate a report of a stolen vehicle. None of the officers used force, and plaintiffs were not detained any longer than was necessary. Further, in light of the circumstances known by the officers at the time, it was reasonable to briefly detain Melonie. Specifically, the manager of the dealership called the police, accused Melonie of lying on her credit application and refusing to return the Captiva, and gave detailed facts to support his allegation. Therefore, George did not violate Melonie's Fourth Amendment rights by briefly detaining her. <u>See</u> <u>Anderson v. Cass Cty., Mo.</u>, 367 F.3d 741, 746 (8th Cir. 2004)(internal quotation marks and citation omitted)("Officers are entitled to rely on the veracity of information supplied by the victim of a crime.").

It was also reasonable for the officers to briefly detain Ashley because she had accompanied Melonie to the dealership and was present when the police arrived. The officers therefore had reasonable suspicion to detain her in order to determine whether

and to what extent she was involved in the alleged crime. Accordingly, George did not violate Ashley's Fourth Amendment rights either.

It is irrelevant that Melonie denies, and was later acquitted of, lying on her application or that Ashley was never charged with a crime because "an officer's reasonable mistake can still give rise to reasonable suspicion." <u>United States v. Cotton</u>, 782 F.3d 392, 395 (8th Cir. 2015). As a result, the court grants summary judgment as to Count I of the complaint.[15]

## B. Continued Seizure in the Escort (Count II)

### 1. Unreasonable Seizure

George also argues that Melonie and Ashley were not seized when they led the officers to Brown's home because they did so voluntarily. Although this may be true as to Ashley, a reasonable jury could find that Melonie was seized. Melonie testified that she only agreed to lead the officers to her mother's house because she did not want to be arrested and that she did not feel free to divert from the caravan of police cars following her. Melonie Dep. at 81:10-13, 82:22-83:3, 109:3-14. In addition, George confiscated Melonie's cell phone and identification. These facts, with all reasonable inferences made in Melonie's favor, support a conclusion that Melonie reasonably believed that she was not free to leave the

---

[15] Because the court finds that there is no constitutional violation as to Count I, it will not address whether George is entitled to qualified immunity as to that count.

car or stop leading the officers to her mother's house. The same facts do not apply to Ashley: she was not threatened with arrest and none of her property was seized. Although she may have felt an obligation to remain because of her sister's situation, or because she needed transportation home, this is not a seizure because it was not the result of an officer's use of force or a submission to an officer's authority. See Delgado, 466 U.S. at 215 (internal quotation marks and citation omitted)("Only when the officer, by means physical force or show of authority, has restrained the liberty of a citizen may we conclude that a seizure has occurred."). Accordingly, the court grants summary judgment on Ashley's claim against George in Count II.

Because a jury could find Melonie was seized, the court must next determine whether a jury could find that the seizure was unreasonable. Again, the parties dispute whether this was a Terry stop or an arrest.

A Terry stop becomes an arrest when the "purported investigatory stop exceed[s] the scope justified under the circumstances." Peterson v. City of Plymouth, Minn., 945 F.2d 1416, 1419 (8th Cir. 1991). In determining whether a Terry stop is transformed into an arrest, a court considers:

> (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person

17

under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

Id. at 1419-20 (quoting United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)).

A jury could find that George exceeded what was permissible under the circumstances by confiscating Melonie's phone and identification and forcing her to lead a caravan of three to four police cars to her mother's residence. First, the number of police officers and cars involved in the incident was excessive given that a nonviolent crime was alleged and that the two suspects were unarmed and generally cooperative. Second, there was no need for immediate action by George. George had Melonie's and Ashley's contact information, knew the make and model of the allegedly stolen car, and had at least a general idea of where the car was located. Further, George himself appeared to believe that immediate action was unnecessary based on his statement that the dispute was a "civil matter." Therefore, even if the dealership decided to press charges, George could have arrested Melonie at a later time, under less threatening circumstances, and after having completed a more thorough investigation. Finally, there was no apparent reason for George to confiscate Melonie's identification because he had her contact information. Under these circumstances, and making all reasonable inferences in favor of Melonie, a reasonable jury could find that George arrested Melonie by forcing

her to lead a caravan of police to her mother's house. See id. at 1420 (finding that officers arrested plaintiff, who was accused of stealing a snowblower, by placing him in the back of a squad car for twenty minutes even though officers possessed plaintiff's contact information, could have arrested him at a later time, and knew that the dispute was a civil matter).

Because a jury could conclude that George arrested Melonie without a warrant, the court must next determine whether George had probable cause to do so. See Aquino, 674 F.3d at 924 ("[A] Terry stop that becomes an arrest must be supported by probable cause."); see also United States v. Evans, 851 F.3d 830, 835 (8th Cir. 2017)("A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime.").

Whether probable cause exists "is determined according to the totality of the circumstances." Evans, 851 F.3d at 835. Therefore, law enforcement "may not disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." Id. (internal quotation marks and citation omitted). Although officers are not required to conduct an unnecessarily burdensome investigation, they "have a duty to conduct a reasonably thorough investigation prior to arresting a suspect ...." Id. (internal quotation marks and citation omitted).

George points to the accusations of the dealership manager and the fact that Melonie arrived at the dealership in a rental vehicle as evidence supporting probable cause for an arrest. The court is not persuaded. In arresting Melonie, George disregarded evidence that Melonie lacked the requisite intent to defraud the dealership. Specifically, he ignored the fact that she arrived at the dealership voluntarily with the first month's car payment and her statements that did not return the vehicle based on the advice of legal counsel. Further, other than speaking with Zarras, George did not undertake any investigation. Indeed, he did not even inspect the allegedly fraudulent documents. Brown Aff. Ex. 1 at 8:00-8:45. Under these circumstances, a reasonable jury could well conclude that George lacked probable cause to arrest Melonie.

### 3. Qualified Immunity

Having concluded that a reasonable jury could find that George violated Melonie's Fourth Amendment rights, the court must decide whether he is entitled to qualified immunity. <u>Littrell v. Franklin</u>, 388 F.3d 578, 582 (8th Cir. 2004). "The doctrine of qualified immunity protects [law enforcement] officers from personal liability under § 1983 insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." <u>Baribeau v. City of Minneapolis</u>, 596 F.3d 465, 473 (8th Cir. 2010) (alteration in original) (citation and internal quotation marks omitted). The

court applies the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (internal quotation marks omitted)(quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

To determine whether George is entitled to qualified immunity, the court first considers whether the alleged facts demonstrate that their conduct violated a constitutional right and, if so, whether the right claimed was clearly established at the time of the alleged injury. Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009). "If the answer to either question is no," then the officers are entitled to qualified immunity. Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010). "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Tatum v. Robinson, 858 F.3d 544, 547 (8th Cir. 2017)(internal quotations marks omitted)(quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014)). A court "must not define clearly established law at a high level of generality," id., but there need not be "a case directly on point." Id. (internal quotation marks omitted)(quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)(per curiam)). "There is no requirement that the very

action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001)(internal quotation marks and citations omitted).

The court finds that George is not entitled to qualified immunity. It is well established that a warrantless arrest of a citizen without probable cause constitutes a violation of the Fourth Amendment. It is also well established that a brief detention becomes an arrest when it exceeds what is reasonable under the circumstances. See Peterson, 945 F.2d at 1420 (holding that officers were not entitled to qualified immunity when they arrested plaintiff without probable cause by exceeding the permissible scope of the investigatory stop). An objectively reasonable officer in George's position would not have believed that forcing Melonie to lead a caravan of police cars to her mother's house and confiscating her identification and cell phone was reasonably necessary under the circumstances. Nor would a reasonable officer believe he had probable cause to arrest Melonie for theft in light of the evidence available and lack of investigation into the allegations. Because George is not entitled to qualified immunity, the court denies summary judgment on Melonie's claim as to Count II.

**C.   Seizure of Melonie's Cell Phone (Count III)**

**1.   Unreasonable Seizure**

Count III of the complaint alleges that George violated Melonie's Fourth Amendment rights by unreasonably seizing her cell phone.  First, George argues that this claim fails as a matter of law because there is no evidence that the phone was searched.[16]  But the fact that George did not search the phone is irrelevant because "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place."  Soldal v. Cook Cty., 506 U.S. 56, 68 (1992).

Next, George argues that summary judgment should be granted on this claim because the seizure of the phone was reasonable.  A warrantless seizure of property is "per se unreasonable unless it falls within a well-defined exception to this requirement."  Dixon v. Lowery, 302 F.3d 857, 862 (8th Cir. 2002).  George does not identify a specific exception, but argues that the seizure was reasonable because it was related to his investigation of the crime.  The court is not persuaded.  There is no evidence in the record that suggests the phone was used or would be used in furtherance of the alleged crime.  Indeed, George fails to state

---

[16]   The parties do not dispute that Melonie's phone was "seized" as that term is understood under the Fourth Amendment.  See United States v. Jacobsen, 466 U.S. 109, 113 (1984)("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property.").

exactly how seizing Melonie's cell phone assisted him in investigating the crime. To the extent that George seized the phone in order to prevent Melonie from calling her mother to "mess up the car," Melonie Dep. at 82:4-10, there is no evidence that Melonie planned to do so. As a result, a reasonable jury could conclude that George violated Melonie's Fourth Amendment rights by unreasonably seizing her phone.

### 2. Qualified Immunity

George is not entitled to qualified immunity. It is clearly established that the warrantless seizure of property is a per se violation of the Fourth Amendment, and no objectively reasonable officer in George's position would have believed that there was a legal basis for the seizure of Melonie's cell phone. Therefore, the court denies George's motion for summary judgment as to Count III.

### D. Search and Seizure at Brown's Home (Count IV)

In Count IV, Melonie Scott, Ashley Scott, and Tase Brown allege that George violated their Fourth Amendment rights by entering the curtilage of Brown's home, despite Brown telling him to leave. George argues that summary judgment should be granted as to Melonie's and Ashley's claims because they did not have a protected privacy interest in the property. The court agrees.

Violations of the Fourth Amendment "cannot be asserted by persons lacking a legitimate expectation of privacy in the place

searched." <u>United States v. Kuenstler</u>, 325 F.3d 1015, 1020 (8th Cir. 2003)(internal quotation marks and citation omitted). Ashley has put forth no evidence that she had a reasonable expectation of privacy in her mother's house. And although Melonie lived intermittently between Ashley's apartment and her mother's house, there is no evidence that she had a privacy interest in her mother's house at the time of the incident. Indeed, neither Ashley nor Melonie provide any evidence to rebut George's argument that they lacked a reasonable expectation of privacy in Brown's home. Therefore, summary judgment is granted on Ashley's and Melonie's claims in Count IV.

Even assuming that Melonie and Ashley had a privacy interest in the property, George argues that plaintiffs' claims should be dismissed because he entered the curtilage only to speak with Brown, Ashley, and Melonie - not to search for evidence. Plaintiffs contend that the officers entered Brown's property, after being told to leave, to conduct a search.

Although the curtilage of a citizen's home is a constitutionally protected area, police officers are permitted to enter the curtilage in order to approach the home and knock "because that is no more than any private citizen might do." <u>Florida v. Jardines</u>, 569 U.S. 1, 8 (2013)(internal quotation marks and citation omitted). Police officers with no warrant, however, are not free to do as they please; their actions are constrained by

the implied license that "typically permits [a] visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id.

Here, George and the other officers entered the curtilage of Brown's home even though Brown told them that they were not welcome. After knocking on the door, Brown again told them to leave, but they continued to linger for about twenty minutes. Therefore, a jury could conclude that George trespassed on Brown's property.

But trespass without an accompanying search is not a constitutional violation. United States v. Jones, 565 U.S. 400, 408 n.5 (2012); see also United States v. Karo, 468 U.S. 705, 713 (1984)("[A]n actual trespass is neither necessary nor sufficient to establish a constitutional violation."). Although Brown testified that there were multiple officers on her property, plaintiffs point to no evidence in the record showing that a search actually took place. Further, even if a jury could infer that a search took place, there is no evidence that George participated in the search. As a result, the court grants summary judgment on Count IV.[17]

**IV.  Fourteenth Amendment (Count VI)**

Melonie alleges that defendant Kne violated her rights under

_____

[17] Having concluded there is no constitutional violation, the court need not decide whether George is entitled to qualified immunity as to this count.

the Fourteenth Amendment by transferring ownership of the Captiva to the dealership without due process. Kne argues that summary judgment should be granted on this claim because Melonie did not have a protected property interest in the Captiva. The court need not resolve the issue of whether Melonie had a protected property interest in the Captiva, however, because even if she did, Kne did not seize it without due process.

When property is seized, the process due to the owner is notice and that the warrant is signed by a "neutral and detached judicial officer." Walden v. Carmack, 156 F.3d 861, 874 (8th Cir. 1998); see also City of West Covina v. Perkins, 525 U.S. 234, 240 (1999)("[W]hen law enforcement agents seize property pursuant to warrant, due process requires them to take reasonable steps to give notice [to the owner] that the property has been taken...."). It is undisputed that Melonie was notified of the seizure and that the Captiva was seized pursuant to a valid warrant. Therefore, Kne did not violate Melonie's due process rights.

Melonie also contends that Kne violated her due process rights by returning the car to the dealership even though the warrant stated that the seized property was to remain in custody subject to a court order.[18] When property is seized pursuant to a search

---

[18] The court notes that Minnesota law allows for the return of allegedly stolen property to the owner. See Minn. Stat. § 609.523. The statute sets forth certain requirements to ensure that the property is returned to the true owner. See id. subdiv. 3(2) (requiring the owner to provide satisfactory proof of ownership).

warrant, there is no constitutional violation so long as there is an adequate post-deprivation remedy. <u>King v. Fletcher</u>, 319 F.3d 345, 350 (8th Cir. 2003); <u>see also</u> <u>Lathon v. City of St. Louis</u>, 242 F.3d 841, 844 (8th Cir. 2001)(finding that having to file four different replevin actions did not constitute an adequate post-deprivation remedy). There is no evidence that Melonie lacked an adequate remedy to challenge the seizure of the Captiva, nor that the actions of the officers interfered with her ability to pursue such a remedy. Therefore, Kne's actions did not violate due process.

Further, even if Kne violated Melonie's constitutional rights, she is entitled to qualified immunity. Melonie points to no legal authority clearly establishing that returning allegedly stolen property to its owner pursuant to a valid warrant is a constitutional violation, and no reasonable officer in Kne's position would have believed she was violating Melonie's rights in doing so. The court therefore grants summary judgment as to Count VI.

## V.    Conversion (Count VII)

Melonie also alleges that Kne committed the common law tort of conversion by seizing the Captiva and returning it to the

---

Although Kne did not fulfill any of the requirements before returning the car to the dealership, Melonie fails to provide any reason why the violation of the statute, which is procedural and does not confer any substantive rights, deprives her of due process.

dealership. The common law tort of conversion is defined in Minnesota as "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession." DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997)(internal quotation marks and citation omitted). To succeed on her conversion claim, Melonie must have had a valid interest in the Captiva and show that Kne unlawfully deprived her of that interest. Williamson v. Prasciunas, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003).

Assuming, without deciding, that Melonie held a property interest in the Captiva, the seizure of the Captiva was not a conversion because it was done with lawful justification – pursuant to a valid warrant.

In addition, even if Kne lacked a lawful justification for seizing the Captiva, the court finds that she is entitled to official immunity under Minnesota law. "The doctrine of official immunity protects public officials from liability for discretionary actions taken in the course of their official duties." Bailey v. City of St. Paul, 678 N.W.2d 697, 700 (Minn. Ct. App. 2004). In undertaking an official immunity analysis a court first asks whether the conduct is discretionary or ministerial. Id. at 701. If the conduct is discretionary, the court asks whether the officer's conduct was malicious or willful. Id. "In the official immunity context, wilful and malicious are synonymous." Rico v.

<u>State</u>, 472 N.W.2d 100, 107 (Minn. 1991). "Generally, police officers are classified as discretionary officers entitled to ... immunity." <u>Johnson v. Morris</u>, 453 N.W.2d 31, 42 (Minn. 1990).

Kne's acquisition and execution of the search warrant were discretionary. Further, there is no evidence that Kne acted maliciously. <u>See</u> <u>Rico</u>, 472 N.W.2d at 107 (internal quotation marks and citation omitted)("Malice means nothing more than the intentional doing of a wrongful act without legal justification or excuse...."). As a result, Kne is entitled to qualified immunity, and the court grants summary judgment on Count VII.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [ECF No. 41] is granted in part as set forth above.

Dated: July 27, 2018

s/David S. Doty
David S. Doty, Judge
United States District Court
